Mr. Marshall, you may call the first case of the morning. Yes, Your Honor. This case will be adopted. 2-16-0432. People of the State of Illinois, Agent Atlee, v. Billet v. LaPointe, Defendant Defendant. Arguing all together is the Defendant Defendant, Mr. Paul J. Blaser. Arguing all together, Agent Atlee, Ms. Lisa Ann Cochran. Thank you, Mr. Blaser. Good morning on behalf of the appellant you may proceed. Thank you. May it please the Court of Counsel. This case is an appeal for the denial of a motion for forensic testing pursuant to 1-16-3 of the Code of Criminal Procedure. Illinois cannot be proud of a history of convicting and imprisoning men who were later found to have been, in fact, innocent. 1-16-3 recognizes that problem and attempted to test and attempt to cure that ailment. Mr. LaPointe sought the protections of 1-16-3 some 15 years ago, but was thwarted because case law at the time prevented the application of that statute to situations involving judgments from guilty pleas. But in 2014, the statute was amended to provide the same opportunity to guilty plea defendants as to trial defendants. So Mr. LaPointe tried again, but his petition was this time dismissed superspondingly. This being a guilty plea judgment under the facts here, these are the standards that we have for allowing this 1-16-3 motion. Can I ask you a threshold question? Sure. Did the trial court dismiss the motion on the basis of ready judicata? I believe that was probably one of the bases for the motion. Can you tell us, before you get into the other facts, why the doctrine of ready judicata would not apply to this situation? I'll answer that, but first let me remind the court the standard here is de novo, not abuse of discretion. So the judge's holding really counts for nothing. But in terms of applying ready judicata, the FTO identity of the parties, we've got that. Obviously, it's the State and Mr. LaPointe. But a final judgment of the merits and identity of the cause of action, we lack those two-letter points. We've never had a final judgment on the merits of this petition. And the cause of action, the claims made by Mr. LaPointe in this case are a little different than what he raised in the first 1-16-3 motion. Also, there's no bar to a second 1-16-3 motion. Beyond that, even, ready judicata is an equitable doctrine, and in cases of fundamental fairness, like when the law changes since the first one, ready judicata can be excused. So the first one, it did not apply. It only applied to trials. And the second one, it was amended, and it applies also to guilty plea situations. Correct. Correct. Now, the three standards for law in the 1-16-3 here are showing a prima facie case in which identity is an issue. No question. The only really issue in this offense is who was the one who committed chain of custody under case law, the Johnson case, which was set in the original brief in 17-18. My clients never touched this evidence. It's been locked up with the State of the County since 1978, and we have to presume that the evidence is still in existence. If it's not, then obviously it's a different case. But as long as it's there, there is the chain of custody. And third, the most important thing, really, is if the forensic testing of the evidence at the scene showed that David Ciccelli or another person was present at the scene, and had that evidence been available prior to the time that Mr. LaPointe pled guilty, is there a reasonable probability that he would have been acquitted? We have to consider that Mr. Ciccelli knew more about this shooting than anyone else. He knew when it was going to happen. He called the police before or after it happened. There's a real problem with his timeline, but he knew more about this case than anyone else. Mr. LaPointe, in his 1-16-3 motion, has pled facts with documentary support, showing a reasonable probability of acquittal. At this stage, his factual pleadings must be accepted as true. He need not completely exonerate himself. That's specifically in 1-16-3C, subsection 2. Defending a guilty plea case need not show complete exoneration. He just needs to show material relevance, which is defined if it significantly advances the defendant's claim. If there's a real possibility that the forensic testimony might result in a viable third-party suspect, that's material relevance. He also has to show reasonable probability of acquittal, that is a probability sufficient to undermine confidence in the outcome of a trial. State likes to use the phrase reasonable likelihood of success. That's not in this case. You know what the motion is. You know what the defendant is seeking. How does it establish that the result of the testing has the scientific potential to produce new non-cumulative evidence? What would this show, the testing and the DNA? What would this show that would be non-cumulative evidence? Well, first of all, there's no forensic evidence linking my client to the scene. His clothing was tested. There were hair fibers found. There were fingerprints found on the cab. None of that matched to him. If it were to show that the fingerprint belonged to David Ciccelli, if it belonged to someone else who's in prison right now on the DOC databank, it would show someone else is a possible likely suspect. It's a cab, though. I mean, isn't it going to show a live fingerprint? Well, true, true. It's a cab, and it could be the whole world was in the thing. But if Ciccelli was one of those people, that's an awfully damning point for the strength of the state's case against my client. None of the gun, the bullets didn't conclusively match the gun. None of the, and he's got now documentary as his support. He has statements from other people who saw him at the time the shooting supposedly occurred. So that would be the non-cumulative nature. Because, again, it's because it is a guilty plea, the only evidence is the state's factual basis. So almost everything is non-cumulative. But the point is that this was not presented, certainly, at the guilty plea hearing, so it would be new evidence, and it could show that there was another suspect, and that's the basis. So sort of what you're saying is that, in a sense, these tests would have been relevant to the guilty plea because it implies that the clarity of testing items is now requested. It might have denied him exculpatory evidence. We couldn't have borne his decision to plead guilty. What's the connection in relationship to the guilty plea? If the evidence shows, if the testing shows that David Ciccelli is the source of the fibers, the hair samples, the fingerprints, then certainly the decision to plead guilty wouldn't have been made. Had the case gone to trial even after that, I think a reasonable trier of fact would have found, wait a minute, they got some other guy's fingerprints and not our guy? Not the defendant's? You asked also to test, did you also ask to test some cigarettes or something? There were some cigarettes found on the scene too, some Marlboro cigarettes. My client ended up in the motion. He said he wasn't a smoker, but Ciccelli was, and Ciccelli was known to smoke Marlboro. It was on the ground next to the camp. Correct. And, again, could have been from anywhere, but could have been from Ciccelli as well. I mean, as long as this evidence is here, it ought to be tested so that we don't have, again, another example of the wrong person having to be convicted for the offense. Your Honor, we believe Mr. McCoy has done his due diligence, has met the burden of his case, and we simply ask that the case go back for the trial court to order, for this court to order the forensic testing of the evidence identified in my client's motion and with the proceedings to follow thereafter. Can I ask you one question? You know, I know that there's different standards under 116.3, but in this particular case, you have statements linking your client to the murder, to the police in a psychological examination and a conversation in the jail. You had three times where he admitted that he did this, and then now he's going to come back and say under 116.3, you better test because it wasn't me. Can we take that into consideration to look at the probability that he would be acquitted? Case law says we can't focus on one bit of evidence. We have to look at the cumulative impact of all the evidence in the case in deciding 116.3. But those statements, first of all, his statements to Ciccelli are questionable because maybe Ciccelli's the guy who did it. His statements to the police were not videotaped, not audiotaped. He didn't say anything. It was simply the police saying he said this. Other statements were made to people in some Timothy Timas, I think his name was. I don't know who he is. Supposedly, he told people in the jail that he was arrested for shooting a cab driver.  That's just a statement of fact. His conduct in the jail, for example, is wearing the T-shirt saying Elmhurst Executioner. It's just as explainable by saying he did that to protect himself from the other bad guys in the DuPage County Jail, which at the time was a very dangerous place to be in. His statements, again, we have cases like the Rivera case, like the Cruz and Hernandez case, like the Edwards case, McCulloch, not McCulloch, the Edwards case, where people are convicted and there's statements presented, evidence presented of statements they made that proved to be false. One of the cases, one of the lower miracles I cited in my brief talks about why people plead guilty, and they plead guilty to avoid the death penalty. That's one reason. That's a good reason here. They plead guilty because of ineffective assistance of counsel, and they also plead guilty because of false confessions. His statements may well have been given for other reasons. May not have been true. May not have been true. May have not been true. But there's a reason why we allow, we call for scientific testing of objective evidence, because it won't lie, we hope. We hope that the scientists will do their job and we'll test the fingerprints and the hair samples and find who was the source of this stuff. Well, you're saying they found who, is it the Cicelli? So now you're saying, oh, we can maybe find out who was the source. Again, Mr. Glazer, we're talking about a taxi cab that picks people up probably every hour on the hour. So how is it that this evidence is going to be so compelling to outweigh the testimony that can be out there in a jury trial, i.e., three statements, you know, a statement to the police, statement to a psychologist, all of these statements in the jail to different people, the testimony of Cicelli. I mean, don't we take that into consideration? Are we wasting our time or chasing our tail, if you will, by saying, well, let's test this, because we might find that it's Cicelli, but if it's not Cicelli, it might be somebody else that's in the ACES system or somebody else that's in the jail. First of all, if it's Cicelli, that's a big thing. Whoever it might be, if I'm the defense attorney and I get a report from the lab showing, here's identifiable people whose fingerprints belong to, I'm going to send my investigator out to see who that person was in the morning or the day of March 7, 1978. I think that's amazing evidence to have, even if I'm a defendant who's made admissions to police or some other people, some guy in jail, big deal. I'm going to take that evidence and really hunt it down and see what I can do with it. And I think I can probably convince a jury that it's someone else and don't believe this confession. How many fingerprints, actual latent prints, are we talking about here? I wish I had the memory of that. I know it's in the report. It's in, the report is appended to the motion, and it's in, like, I'm not exactly sure how many were. Certainly more than one, but there were latent prints. Do we know where in the cab they're taken from? I don't think the report had that. Well, I think if you carefully look at, if you hold a couple reports together, one may say where the one print was found, like point A, B, C, D. One of the reports lists the locations, like A, B, C, D, to M and N, whatever, and then the other report says this came from location M. Your client has a long history of trying to bring points that he deems important before the court. Yes, he has. When did he first ever bring this specific issue before the court? Was it just in this petition? The forensic evidence? The fingerprints that were there that could have been analyzed and compared and worked. Well, he certainly brought it back in 2004, whatever, 15 years ago, 2003, whatever my math is. That's when Reifus raised his first 116.3 motion. But the statute didn't allow it. Right, right. So he was actually guilty. He was ahead of the curve on that one. It was clairvoyant. Well, you know. And also the APHIS system wasn't around at that time. Neither APHIS nor DNA. I could go on for more than 15 minutes about how the law has changed to Mr. LaPointe's detriment since 1978. But here the law has changed in his favor. And I hate to be flip about this, but, you know, as one person said, what do we have to lose? What do we have to lose by letting the head of the state conduct a test? We're not in a hurry. It takes a couple of weeks, a month, whatever, a couple of months. We'll wait. Let's take the test. Let's see what happens. And we can finally close this part of the case. Thank you. Thank you very much, Mr. Glazer. You'll have time on rebuttal. Ms. Hoffman, on behalf of the people. Good morning, Your Honor. Thank you. Ms. Hoffman, Assistant State's Attorney on behalf of the people. Well, I guess I'll start with the final comment that Mr. Glazer made, which is what do we have to lose? And I do not see in 116.3 anywhere the statement, what do we have to lose by testing? Without a doubt, 116.3 came about because there were advancements in forensic testing, what we are able to tell from evidence after the fact. And there were concerns, no doubt, about the possibility of innocent people being incarcerated and or sentenced to death. Which is a legitimate concern. Undoubtedly. That doesn't mean that everybody should get their evidence tested just because it wasn't tested before. If that were the case, we would need to have thresholds. In fact, all we would need is just something that says if you get testing before or if you did get testing before and there's more advanced testing, then you get to test. And that's not what 116.3 says. But this evidence was admittedly never tested before, was it? This evidence was not ever tested before. Obviously, in 1978, we didn't have many of the advancements or admittedly any of the advancements. I mean, basically the print testing, that kind of thing. But in 2004, so Justice Spence, in answer to your question, yes, in 2004, he raised this issue in his original 116.3 petition. But in 2004, that was not applicable to this case? Absolutely not. And the people are not in any way arguing that that petition precludes anything to that. Our arguments regarding that petition are, I mean, the petition today are. Tell us what would make him, what would he need, what would Mr. Glazer need in order for us to find in favor of Mr. LaPointe in order to allow this to be tested? Well, the statute tells us that he needs to show that he has non-cumulative evidence that would, and again, the people are, for purposes of this argument, we're not arguing about whether or not identity is an issue or whether or not there's a chain of custody, things like that. But for purposes of that third prong, would raise a probability that the defendant would have been acquitted if the results of the evidence to be tested had been available prior to the defendant's guilty plea and the petitioner had proceeded to trial instead of pleading guilty. He would have been acquitted, a reasonable probability. Well? It's not absolute, is it? No, it's not absolute. But it does say acquittal, and it is different than the portion of the statute that applies to people that went to trial. So early in his argument, Mr. Glazer said that the 2014 amendment to this statute, which allowed for testing for people that had pled guilty, offered Mr. LaPointe a new opportunity, or I'm sorry, he said the same opportunity. The amendment doesn't offer the same opportunity to Mr. LaPointe that it does to somebody who went to trial. And in the reply brief, the defense does attempt to minimize my citation to that Thomas case out of the third district, which is a relatively recent case interpreting this portion of the statute. But I think Thomas is right on point in that it says if the legislature meant that the same standard applied to those who went to trial regarding forensic testing and those who pled guilty, they would have had to change the statute the way they did. They could have made a simple addition. Instead, they used a completely different language. So we know that he has to show something greater than simply material relevance. It specifically says he needs to raise the probability that he would have been acquitted. So let's look at what he's asking for. And I guess, Justice Sessom, rather than I may be answering your question sort of the other way around, which is why what he has brought isn't sufficient, but what would he need to bring to show that it's sufficient? In this instance, he says the defendant's motion and then the brief on appeal also refer to Mr. Tichelli, but then sort of offhandedly or maybe like, you know, sort of over here, mention any other person or the really guilty person. First of all, we have no reason to believe the defendant doesn't argue that or doesn't assert that Mr. Tichelli's DNA profile is available in any of these systems. So we have no reason to believe that even if we went and tested this, that we would have anything to compare it against vis-a-vis Mr. Tichelli. And with respect to any other person in the system, well, it's a public cat. Who knows who may have been in that and then committed a crime previously or subsequently and had their DNA tested and put in the database? That's not going to give us any kind of concrete evidence that would have acquitted the defendant when you balance it against what was the evidence. It is true, there's not a lot of physical evidence in this case. It was a fairly short period of time that he spent in the cab, and it was a public cab, so, you know, he got, according to the, his own statements, got into the cab, you know, shot the cab driver, asked him to drive to Will Commons, shot him in the back of the neck, took his wallet and identification, moved the body so that he could drive the cab to another location, and that's the extent of the time he spent in the cab. So perhaps there's not a lot of physical evidence. Perhaps he had, in any event. How long after this shooting was the defendant arrested? Within a day. It was within, I believe it was within 24 hours. Because, again, he had started his day by telling Mr. Tichelli that this was what he was planning to do. And so when they found the cab driver later that day, or maybe it was the next morning, I'm sorry. I would have to review that. Didn't lie. Did he go to school afterward? There's testimony, there are people that say they saw him around the school. There's certainly, as police reports, for people that say they believe they saw him at the school, around the school at a certain time. But then he went back and talked to Mr. Tichelli later on in the day to say that he had, in fact, done this. And so, I guess, you know, a fairly short period of time between. And then the child found the cab driver dead in the cab and they called the police. Admittedly, as has been pointed out by my colleagues, a prince in a cab, you know, a public cab is going to be difficult to pin down. But it seems to be that, I mean, what about if Tichelli's hair samples or his prints were found in the cab? Wouldn't that be significant? Not particularly. Mr. Moreno drove a cab in the area where all these people lived, and so it worked. So he would have picked up Mr. Tichelli by sheer coincidence? Potentially. I mean, again, I'm not completely familiar with the cab business in the 70s in Elmhurst, but it's not an overly large metropolitan. It's not like Chicago where you've got cab drivers, you know, hundreds of cabs. Elmhurst is a suburban community. I assume there weren't a huge number of cabs. And so it's possible that any number of people that live in the community might have used that cab at any given time. Now, let me ask you a point of question. One of the themes of Mr. Glazer's argument seems to be that statute such as this, one of the underlying fundamental reasons is to produce foster confidence in the ultimate result. In other words, somebody might say it's to make sure the system got it right, which is always an overarching goal. So doesn't the testing in the close case vindicate that goal to try and produce confidence in the ultimate result and foster the confidence that the system got it right? Comes back, it doesn't match Ciccelli or anybody else. Okay. What's the hard one? Well, first of all, you said testing in the close case. So I'm going to put this case. I don't mean the close case in terms of the reason. I'm talking about the motion. Okay. He's got a plausible argument that Ciccelli was never tested. He was the one who seemed to know about the case. No other witnesses. You know, on the motion. And I'm characterizing really in your favor saying it's close. But irrespective of that, what is the why doesn't this also err in fostering the purpose of the statute? Why do we have these statutes if it isn't to foster confidence in the result? We wouldn't have them, would we? Well, I don't disagree with that general principle. But I also, as I began my argument, think that if the intent was that any time we haven't tested things, we should. No, it couldn't be. I think we would have been. And so I guess my – and I hate to – I'm going to say, among other things, resources. We don't really have a reason to doubt the situation in this case. Mr. LaPointe pled guilty. And for the majority of the time that he has been challenging his – no, the majority of the time that he has been filing challenges, he has not challenged his conviction. He primarily challenged his sentence for the first 20 years of his incarceration. And that's fine. He's entitled to do that. And I have found Mr. LaPointe and his attorneys worthy opponents for all these years. However, we don't have reason to believe that there's any – that there's not confidence in Mr. LaPointe's guilty plea. And if, in fact, we are now close to 40 years – and that's frightening when I think of my own age – but 40 years after this murder, that we're going to now test things because Mr. LaPointe now has decided that, obviously, David Ciccelli did this. He did not do it, when that's not been anything that had really been on the agenda. But as you can see, he wasn't able to do it under the statute before it was amended. Well, even if we went to 2004 and said 30 years, or, you know, give or take, the fact is that Mr. LaPointe – He's never challenged anything but his sentence. Not – and, again, I completely agree that in 2004 he filed this motion for forensic testing. But, in general, his challenges have been about his sentence. In the briefs defense counsel makes a lot of his statement at the guilty plea where after the factual basis was read, which was quite lengthy and detailed, the judge asked, you know, was that – you know, did they agree that's what – I think Mr. LaPointe's statement was, that's mostly true. He didn't say, oh, it's mostly true except for the part where I did it. I mean, you know, this is not a questionable case in terms of guilt. And I think Thomas speaks to that when it says, look – and Thomas was a recantation. And they said, you know, okay, so maybe if we'd had a trial, she would have recanted and maybe there would have been, you know, maybe the – But what you have to show, the gap of testing, is more than that. And in this instance, the people are adamant that in this instance we do not have – not evidence that would demonstrate that he would have been acquitted if it had been presented at trial. Ms. Hoffman, are you still of the position that this is race-judicial? I do – I still am of the position. Are we on the same cause of action? Well, even if we don't – so I will say, even if you don't consider these to be the same cause of action, because then collateral stopper comes in to say – I mean, we are in a situation where – and that's why I made the two arguments independently. I am aware, as I stated in my brief, of the standard of review. I don't think that the fact that it's a de novo standard of review means that I have to say – I mean, I thought the trial court's ruling was appropriate, so I'm not saying you have to defer to that. I simply am saying I believe that issue conclusion is at play here. This Court has determined that he can't demonstrate actual innocence by way of this same forensic evidence that Mr. Point claimed his counsel should have tested. So if he can't demonstrate actual innocence, I'm not sure how he's going to demonstrate that he could be acquitted if this evidence were used. And so in the people's mind, that demonstrates that this issue has been decided and we don't need to decide it again. That's the reason for issue conclusion. Do you remember – and I had asked Mr. Glazier the same question – where those latent prints were recovered from? I do not. Would it make a difference if the print was recovered from the steering wheel of the cab? No. No, it wouldn't. I was just trying to remember if I thought that that's where – I personally think that the latent prints were from the back of the cab, but I – If they're from the passenger portion of the cab, they would be – let's put it this way – they would be a lot less probative than if it was recovered from the victim's wallet. Right? I mean – Go ahead. Can I answer your question? You know, I don't know. I guess the point is that I suppose that we know that Mr. LaPointe's prints, those prints didn't – they weren't able to get a good match with Mr. LaPointe's prints. So I don't know. I mean, I don't have – no, I guess my answer would be no, I don't think that the prints, you know, any – from the wallet, I don't know whether – Did you tell his prints on the cabbie's wallet? Are you suggesting it wouldn't be relevant? Would he have a reason to be touching the cabbie's wallet? I don't know. I mean, I suppose that that would be more relevant than some things. I would say, yes. Right. True. They all live in the same small area. If there are no further questions, we would ask that the court affirm. Thank you. Thank you, Ms. Hoffman. Mr. Glazer, you may address the court, if you'd like. Your Honor, first I'll chalk this up to the modern times and e-records, but this is an e-record and it's in my laptop with me. Otherwise, I could find the page where the scraps from all the fingerprints were found. So, again, it's in the record. Mr. Glazer, Ms. Hoffman sort of thrown down the gauntlet and asked a specific question. What would you be hoping for, best case scenario in this testing, what result are you hoping for and how would that establish a reasonable probability of the defendant's support? Well, the best result would be to state that Saccelli's fingerprints and hair samples were found inside the car. And she did ask, we don't know if Saccelli's in the system, if we got a DNA result. Again, with all due respect to the State on this case here, we do know that Saccelli was, in fact, on probation at the time of this guilty plea below. Even though the State never disclosed this in pretrial discovery, my client has learned that Saccelli was, in fact, on probation. It's not unreasonable to think that a person who's on probation might get in trouble again. So maybe he's in the system in Illinois, maybe he's in the system in some other state. It's a national-type system, so maybe he's somewhere. Again, speculative? I don't know. I don't think so. I think it shows there's a reasonable probability of acquittal if we can show that it's his fingerprints. This is not a sudden claim. My client was 18 when he pled guilty. It was a couple weeks after turning 18. He thought he would get a much better deal than natural life in prison without parole. He's been fighting this thing every way he can, and you can't blame the kid for doing that. Again, since the guilty plea when he says, oh, most of it is true but some isn't, and then he sends a letter to his lawyer two weeks later when he gets to Joliet saying, what are you talking about? What happened here? He's been fighting this thing every way he can. He's been fighting the sentence. He's been fighting the plea. He's been fighting the advocate as much as he can. He's not a college-educated lawyer. He's an 18-year-old kid who was sent to DOC with a severe drug problem who's doing the best he can to file pleadings that fit under the law. You look through this 4,000-page record and see he files these pleadings that kind of don't make sense, but they do make sense to someone who isn't versed in what just a constitutional claim means and words like that. Of course, there has to be some stature. I'm not saying, oh, just test everybody. There has to be material relevance. There has to be a reasonable probability of acquittal. But the case law that we found sides with giving the defendant the test. As long as there is a question of identity surrounding the offense. Cases from this court, like Kynes, like Rosa, which are citing their briefs, where there's a real question about who was the criminal, who's the guy who committed the crime, we'll let him have the test. Cases where there's no identification, like the Thomas case where the state cites, the guy would be convicted even without any DNA results because he was charged and convicted of unlawful use of weapons, and the sawed shotgun was found in his car. There's enough right there to convict the guy. You don't need DNA. If 18 other people, even if it's the Jallie's fingerprints were found in the sawed shotgun in the Thomas case, it wouldn't make any difference because, obviously, Thomas was guilty. Where there's an identity question, they give the guy the test.  So, therefore, yes, the judgment will be reversed and remanded for that test. Ms. Hoffman, come on up here. Mr. White, come on up. I just want to talk to her. I don't think I'm just talking to him, but how are you? I'm good, how are you? All right, I'd like to thank both counsel for the quality of their arguments here this morning. The matter will, of course, be taken under advisement. A written decision will be issued in due course. We'll stand in brief recess to prepare for the next case. Thank you.